```
                    UNITED STATES DISTRICT COURT          FILED
                    NORTHERN DISTRICT OF ALABAMA       98 JAN 16 AM 11:32
                         SOUTHERN DIVISION
                                                       U.S. DISTRICT COURT
                                                        N.D. OF ALABAMA
RONALD T. MEADOWS,             )
                               )
      Plaintiff,               )
                               )
vs.                            )    Civil Action No. CV-96-S-1792-S
                               )
BAPTIST HEALTH SYSTEMS,        )
INC. d/b/a BAPTIST MEDICAL     )
CENTER PRINCETON,              )                       ENTERED
                               )
      Defendants.              )
                               )                       JAN 16 1998
```

## MEMORANDUM OPINION

Ronald T. Meadows was employed by Baptist Medical Center Princeton ("hospital") from January 6, 1986, until December 13, 1995, working in the capacity of a staff registered nurse in the hospital's psychiatric ward. His annual evaluations reflect satisfactory or better performance in that position until the night of December 2-3, 1995. (Meadows Affidavit ¶ 3; Jan Black Deposition, Exhibit 12.) On that evening, Meadows worked a twelve-hour shift, beginning at 7:00 p.m. on Saturday, December 2, 1995.[1] Meadows admits that he committed two significant nursing errors involving the delivery of medications to patients during that shift.

### I. SUMMARY OF FACTS

**A. The Omitted Locked Unit Medications**

The hospital's psychiatric ward has two units: a psychiatric intensive care unit ("PICU"), which is a locked facility housing

---

[1] Meadows was a "Baylor" employee, which means that he worked two twelve-hour shifts on weekends. (See Jan Black Deposition at 21.)

the "most critical" patients; and, the open unit, for care of patients with less severe problems. (Black Deposition at 124.) One of Meadows' primary responsibilities was to administer medications to all PICU patients at 10:00 p.m. (Meadows Deposition at 37; Turner Affidavit at 5.) The hospital's written "Guidelines for Giving Medications" specify that "[a] medication should be given no more than one hour before or after the designated time, except at the discretion of the team leader." (Plaintiff's Exhibit 4, ¶ 9.) Meadows thus had a two hour span (9:00 to 11:00 p.m.) within which to discharge his duties. He did not do so; he totally failed to deliver nine prescribed medications to the three patients then housed in the PICU unit.[2] (Meadows Deposition at 35-38; Plaintiff's Exhibit 5 at 2.)

At 10:30 p.m., registered nurse Jane Blackwell reported to work an 11:00 p.m. to 7:00 a.m. shift in the hospital's psychiatric ward. Her precise responsibilities that night are unclear, but Meadows contends she assumed partial care of PICU patients.[3] (Meadows Affidavit ¶ 11.) The parties dispute whether Blackwell was expected to review patient charts to determine whether

---

[2] Instead, as discussed in § I.B, at page 4 *infra*, Meadows voluntarily assumed the 10:00 p.m. duties of another nurse (Barbara Turner): *i.e.*, the administration of medications to all patients housed in the open unit. Perhaps that is why Meadows neglected ("forgot," to use his verb) to perform his own, assigned duties in this instance. Neither Meadows' testimony (*see, e.g.*, Meadows Deposition at 38-39) nor other portions of the record (*see, e.g.*, Plaintiff's Exhibit 18, ¶ 3) are instructive on the issue of "Why?"

[3] This point is disputed. The court, however, considers the evidence in the light most favorable to plaintiff, as it must. *See* Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970) Even so, what the court states as facts in this opinion "may not be the actual facts. They are, however, the facts for present purposes." Montoute v. Carr, 114 F.3d 181, 182 (11th Cir. 1997) (*quoting* Swint v. City of Wadley, 51 F.3d 988, 992 (11th Cir. 1995)).

2

medications had been properly administered during the previous shift. (Compare Turner Affidavit at 5 with Black Deposition at 92-93.) In any event, it is clear that no one noticed that medications had not been given to any PICU patient until approximately 5:30 a.m. (Meadows Deposition at 39.) When that omission was discovered, Blackwell and Barbara Turner, another registered nurse on duty that night, confronted Meadows. He admitted his dereliction of duty. (Id.) Meadows consulted the medical administration record

> to see what meds could possibly be given at 6:00 that morning and which meds I should not give, to hold, because they were going to get them at 7:00. And I weighed — I was weighing in my mind which medications it would be best to go ahead and try to give them at that time.

(Id. at 40-41.)

Meadows had no authority to alter any patient's prescribed medication schedule. (Meadows Deposition at 47.) He nevertheless contends that, following a discussion with Blackwell and Turner, the three of them concurred in a plan to compensate for his error. According to Meadows, Blackwell and Turner agreed that he should administer omitted medications to two PICU patients at 6:00 a.m. — eight hours late — and skip the third patient's medication entirely. (Id. at 38.) He charted the late doses on each patient's medical administration record. He then notified nurses reporting to work the following shift that they should "stagger" delivery of those patients' morning medications, to avoid overdosing the patients. (Id. at 44.)

3

B. The Un-Charted Open Unit Medications

During the same shift, Meadows volunteered to administer 10:00 p.m. medications to all patients in the open unit, even though that was the responsibility of another nurse on duty that night (Barbara Turner).[4] (Meadows Affidavit ¶ 9.) He recorded that assumed duty as one of his assigned duties for the night. (Id.) He neglected, however, to sign-out for those medications as required by hospital procedures, to reflect their delivery to patients.[5] (Meadows Deposition at 35.)

C. The Self-Reporting Violations

The hospital's "Guidelines for Giving Medications" instruct nurses to "[r]eport any errors immediately to charge nurse and attending physician. Fill out Quality Assurance report, chart medication given or omitted in error on patient's Clinical Record." (Plaintiff's Exhibit 4, ¶ 13.) Meadows admits that he did not comply fully with those directives. (Meadows Deposition at 45, 48.)

Meadows did not report the medication changes he made, or his failure to administer medications, to either the night-shift charge nurse[6] or attending physicians. Instead, he asked two nurses on the next shift to "notify the doctor that made rounds and they said

---

[4] See note 2 supra and related text.

[5] Meadows testified that he thought he had recorded delivery of some of the medications to two patients, but could not recall precisely. (Meadows' Deposition at 36.) It is undisputed that, as to at least some of those medications, Meadows failed to make a chart notation that they had been given.

[6] No on duty charge nurse was designated for the night of December 2-3. Defendant claims that a charge nurse is always available, even if they are not on premises.

4

they would."[7]  (*Id.* at 41-42.)

Moreover, he did not complete a quality assurance report on the late medications, because of his opinion that the error had been remedied: "On occasion medicines have been missed and we stagger at times. And so I asked the oncoming shift if they would be willing to stagger their meds and they agreed to. So, I did not fill one out." (*Id.* at 44.) When Meadows reported to work for his next twelve-hour shift at 6:30 p.m. on Sunday, December 3, 1995, he verified that attending physicians had been notified of each PICU unit patient's late medications by day shift nurses. (*Id.*)

It is unclear from the record before this court whether Meadows' failure to sign-out for ("chart") the open unit medications implicates the self-reporting procedures described above. In any event, plaintiff did not report his failure to chart to attending physicians, nor did he complete an incident report. He did, however, call Barbara Jefferson, day shift charge nurse, on Monday morning to discuss his failure to chart open unit medications the preceding Saturday night. (*Id.* at 48-49.) Plaintiff testified that she said "well, that's okay. Just come by when you can and sign out for them." (*Id.* at 49.) Even if that is what Jefferson said, plaintiff never did so.

D.  Disciplinary Action

Jan Black, the hospital's director of psychiatry, met with

---

[7] Meadows identified those nurses as Terry Stewart and Bonnie Lee. (Meadows Deposition at 42.) Stewart was the assigned day shift charge nurse; thus, Meadows contends that he complied with the directive to notify the charge nurse of errors. (*Id.* at 46.)

5

plaintiff on December 7, 1995, to discuss his actions on the night of December 2-3, 1995. (*Id.* at 66.) Following that conference, Meadows was suspended and told not to report for work until further notice. (*Id.* at 48.)

According to Black, nurses ordinarily are not disciplined for errors in the administration of medications, provided

> they follow through and take the appropriate action, which includes notifying the charge nurse, notifying the patient's physician, filling out an incident report. ... So we typically do not take disciplinary action if somebody gives a wrong medication, or omits a medication, or gives a medication to the wrong patient.

(Black Deposition at 53.) That policy is intended to encourage the reporting of medication errors, so that prompt corrective action can be taken if necessary. (*Id.* at 55.)

Jan Black nevertheless recommended Meadows' discharge in a December 12, 1995 letter to James Warren, director of human resources, based on the following findings:

1. Ron was assigned to give meds for all patients on 1 East on the open unit and 3 in PICU.

2. Ron failed to give all medications to the patients in PICU and failed to document giving medications to the patients on this hall.

3. Ron failed to notify the 3 physicians and Charge Nurse or Unit Director at anytime.

4. Ron gave the 10 p.m. medications at 6:00 a.m. on his own authority.

5. Ron was outside of Nursing practice with regard to the 5 Rs of giving medications, i.e., right time and also outside of hospital policy which states the nurse has 1/2 hour before to 1/2 hour after the order time of giving

6

medication.[8]

6. Ron failed to fill out an incident report on this occurrence even though this is called for if medication is omitted or given at the wrong time....

7. There were no extenuating circumstances that occurred on the unit on 12/3/95 that contributed to Ron's "forgetting" to give the medications.

8. Ron continues to fail to see the concern here by making statements like "nothing detrimental happened to the patient."

...

Recommendation:
Given the magnitude of this error (9 medications not given to 3 patients for 8 hours) and Ron's failure not to acknowledge his error, I recommend that he be terminated from employment at this time.

(Plaintiff's Exhibit 5 at 2.)

Black's recommendation was accepted by James Warren, the hospital's director of human resources, and Meadows was discharged on December 13, 1995. This lawsuit followed.

Meadows alleges gender discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e et seq. He claims his termination was discriminatory, because the hospital did not discharge female nurses who committed similar errors. The matter now is before the court on defendant's motion for summary judgment.

## II. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides

---

[8] Black admitted in deposition that this statement was in error. As noted in text on page 2 supra, the hospital's "Guidelines for Giving Medications" permit a one hour variance on either side of the prescribed time for delivering medications to patients. (See Black Deposition at 117 and Plaintiff's Exhibit 4, ¶ 9.)

7

that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

"An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.*

The moving party has the initial burden of showing the absence of a genuine issue as to any material fact. *Id.* In determining whether this burden is met, the court must view the evidence "and all factual inferences arising from it in the light most favorable to the nonmoving party." *Id.* (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)).

Once the movant's initial burden is met, the burden shifts to the nonmoving party to point out "specific facts showing that there is a genuine issue for trial." *Id.* (quoting Fed. R. Civ. P. 56(e)). In meeting its burden, the nonmoving party may "avail itself of all facts and justifiable inferences in the record taken as a whole." *Id.* (quoting *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992)(citations omitted)). "The evidence of

8

the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* (quoting *Tipton*, 965 F.2d at 999 (citations omitted)). Even so, a "mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Id.* (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)).

### III. TITLE VII CLAIM - DISCRIMINATORY DISCHARGE

Title VII "prohibits employment discrimination on the basis of gender, and seeks to remove arbitrary barriers to sexual equality at the workplace with respect to 'compensation, terms, conditions, or privileges of employment.'" *Henson v. City of Dundee*, 682 F.2d 897, 901 (11th Cir. 1981)(citations omitted). When, as here, a plaintiff relies on circumstantial evidence to prove a charge of unlawful discrimination, the evaluation of that proof occurs within a framework developed by the Supreme Court in three decisions: *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); and *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). *See also United States v. Crosby*, 59 F.3d 1133, 1135 (11th Cir. 1995). First, plaintiff's presentation of evidence establishing a *prima facie* case "creates a rebuttable presumption of unlawful discrimination." *Crosby*, 59 F.3d at 1135 (quoting *Armstrong v. Flowers Hospital, Inc.*, 33 F.3d 1308, 1313-14

9

(11th Cir. 1994). Next, the defendant may rebut the presumption established by a *prima facie* showing "by articulating a nondiscriminatory reason for its actions." *Id.* (citation omitted). Finally, if the defendant satisfies its burden of articulating a nondiscriminatory reason for its actions, the presumption of discrimination raised by a *prima facie* case "simply drops out of the picture," and the sole inquiry becomes whether the plaintiff has proven intentional discrimination. *Id.* (quoting *St. Mary's*, 509 U.S. at 511, 113 S.Ct. at 2749, 125 L.Ed.2d 407. Evidence that similarly situated employees were treated differently is of probative value, but does not always establish that intentional discrimination occurred. *Id.*

### A. The *Prima Facie* Case

Title VII provides that "[i]t shall be an unlawful employment practice for an employer ... to ... discharge any individual ... because of such individual's ... sex...." 42 U.S.C. § 2000e-2(a). Although the *McDonnell Douglas* framework was formulated in the context of a claim for discriminatory failure to hire, "the purpose underlying that method of analysis — to focus the inquiry by eliminating 'the most common nondiscriminatory reasons' for the employer's action — retains equal validity where discriminatory discipline is alleged." *Jones v. Gerwens*, 874 F.2d 1534, 1539 (11th Cir. 1989)(citations omitted). The Eleventh Circuit has

> consistently held that a plaintiff fired for misconduct makes out a prima facie case of discriminatory discharge if he shows that he is a member of a protected class,

10

that he was qualified for the job from which he was fired, and "that the misconduct for which [he] was discharged was nearly identical to that engaged in by [an employee outside the protected class] whom [the employer] retained."

*Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984)(quoting *Davin v. Delta Air Lines, Inc.*, 678 F.2d 567, 570 (5th Cir. Unit B June 14, 1982)(emphasis added)); *accord McDonald v. Sante Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976)(holding that employer would violate Title VII if it fired black employees who participated in theft of cargo while retaining equally guilty white employees); *Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir.), *cert. denied*, 449 U.S. 879, 101 S.Ct. 227, 66 L.Ed.2d 102 (1980)("With respect to discharge for violation of work rules, the plaintiff must first demonstrate by a preponderence of the evidence either that he did not violate the rule or that, if he did, white employees who engaged in similar acts were not punished similarly").

Meadows is a member of a protected class, and is qualified for the job from which he was fired. He admits violating work rules. Plaintiff's *prima facie* case therefore turns on this inquiry: were female nurses who made nearly identical errors disciplined less severely than Meadows?

The burden is on Meadows "'to show a similarity between [his] conduct and that of [female] employees who were treated differently and not on [the defendant] to disprove their similarity.'" *Jones*,

11

874 F.2d at 1540 (quoting *Tate v. Weyerhauser*, 723 F.2d 598, 603 (8th Cir. 1983); *see also Burdine*, 450 U.S. at 258, 101 S.Ct. at 1096 ("it is the plaintiff's task to demonstrate that similarly situated employees were not treated equally"). The acts of allegedly comparable misconduct need not be precisely identical; but they must be "nearly identical" (*Nix*, 738 F.2d at 1185) and of "comparable seriousness." *McDonald*, 427 U.S. at 283 n.11, 96 S.Ct. at 2580 n.11 (quoting *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825). Moreover, the female nursing employees

> with whom [plaintiff] seeks to compare his conduct must have dealt with the same supervisor, have been subjected to the same standards and have engaged in the same conduct without such different or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (8th Cir. 1988).

Meadows points to numerous errors by female nurses which he contends were similar in seriousness to his own, yet resulted in less severe discipline. Each allegation is discussed below.

### 1. Bonnie Turner and Jane Blackwell

Meadows claims in brief that, upon discovery of his failure to administer prescribed medications to patients in the PICU unit, he, Barbara Turner, and Jane Blackwell "decided between all three of [us], to give the medicine right then, put the correct time the medicine was given on the M.A.R. report,[9] and then, make the oncoming shift aware of what had been done." (Plaintiff's Brief at 11.) Only Meadows was disciplined for such actions, yet he

---

[9] Medical administration record.

12

contends the decision to commit the acts was jointly made by all three nurses. Barbara Turner's affidavit supports Meadows' claim on this point. (Turner Affidavit at 6.)

Even if Meadows' account of the birth of a strategy to compensate for his negligence is true, he directs this court to no evidence indicating that Turner's and Blackwell's suggestion of, or acquiescence in, the remedial plan was a nursing error comparable in seriousness to his own. Meadows admits that he was responsible for administering medications to PICU patients at 10:00 p.m. (Meadows Deposition at 36.) He admits that he neglected to perform that duty. (*Id.* at 38.) Neither Turner nor Blackwell was responsible for administering those medications, and Meadows presents no evidence to the contrary.[10]

Simply put, even if Turner and Blackwell participated in the formulation of a plan for ameliorating the potential consequences of Meadows' negligence once it was discovered, such conduct does not suggest a nursing error similar in magnitude to Meadows' total failure to give nine medications to three of the hospital's "most critical" psychiatric patients. Moreover, neither Turner nor Blackwell was the charge nurse that night, and neither had

---

[10] Meadows states in affidavit that Blackwell was responsible for the PICU unit patients during her shift, but that shift began at 11:00 p.m., after the time medications should have been administered by Meadows. (*See* Meadows Affidavit ¶ 8, 11.) Meadows also claims that Blackwell should have "assess[ed] the patients, look[ed] at the medication administration records and charts when [she] first [came] on duty" rather than later that morning. (*Id.* ¶ 11.) Yet, Meadows directs the court to no hospital guideline or policy which supports this conclusory description of "routine practice." Jan Black denies the existence of any such policy. (Black Deposition at 92-93.) In any event, in the absence of precise guidelines to the contrary, the court is convinced that a failure to review the prior shift's work would not be as serious an infraction as Meadows' failure to administer medications at prescribed times.

13

authority to approve or disapprove of Meadows' conduct. Indeed, Meadows does not allege that they had such authority. While Turner and Blackwell's support may have emboldened Meadows to handle the matter as he did, Meadows presents no evidence that such support constitutes a nursing error comparable to his own.

2. Bonnie Lee

Meadows claims that licensed practical nurse Bonnie Lee once gave the wrong medication to a patient. (Meadows Deposition at 51-52; Meadows Affidavit ¶ 25.) The hospital admits this error occurred, and that Lee was not discharged for it. (Defendant's Brief in Support at 11.) Even so, the infractions are not comparable. First, Meadows' discharge resulted from his failure to administer nine medications to three critically ill patients, compounded by his failure to properly report his omissions. Lee's single error hardly compares. Second, defendant produced evidence that Lee, unlike Meadows, notified the attending physician, notified the charge nurse, and completed an incident report following her error.[11] (Black Deposition at 136-37.)

3. Sylvia Weis

Meadows claims that registered nurse Sylvia Weis committed two medication errors, yet was not terminated. (Meadows Deposition at

---

[11] Meadows claimed in deposition that he did not know whether Ms. Lee complied with the hospital's self-reporting procedures regarding this incident. (See Meadows Deposition at 52.) Plaintiff may not give "clear answers to unambiguous questions" in a deposition and later attempt to create a genuine issue of material fact in a contradictory affidavit that fails to explain the contradiction. Van. T. Junkins and Assoc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984). Accordingly, this court disregards that portion of Meadows' affidavit which contradicts his deposition testimony on this point. (See Meadows Affidavit ¶ 25.)

14

52.) First, Meadows claims that Weis failed to administer medication within the prescribed timeframe because it was late arriving from the pharmacy. (*Id.* at 52.) When the medication had not arrived by the end of Weis' shift, she allegedly asked Meadows to administer the medication for her during his shift, which he did. (*Id.* at 52, 55.) Even so, Meadows presents no evidence that Weis failed to comply with the hospital's self-reporting procedures on this incident, and admits ignorance on that point. (*Id.* at 53.)

Second, Meadows claims that on another occasion Weis called the attending physician with a question about a medication, but "she didn't hear back from the physician [during her shift], so she just asked the oncoming shift if they could get in touch with the physician or just take care of it." (*Id.* at 59.) Meadows admits that Weis reported this incident to the attending physician, and offers no evidence that she failed to complete an incident report. (*Id.* at 60.)

The court does not find those alleged errors comparable to Meadows' failure to administer medications to an entire unit. Moreover, there is no evidence identified in the record which would establish whether Weis failed to comply fully with the hospital's self-reporting procedures for either medication delay. Indeed, there is no evidence that either incident was the result of a nursing error which would implicate those procedures. Neither incident involved "forgetfulness" by a nurse; rather, in each case, delay was the result of factors outside the nurse's control.

15

Absent evidence that Weis' conduct was the result of a nursing error like Meadows', or that she compounded her errors by failing to properly report them, those incidents cannot be treated as comparable in seriousness to Meadows' errors, and do not support an inference of discrimination.

### 4. Terry Stewart and Lorraine Beavers

Meadows alleges that registered nurse Terry Stewart and licensed practical nurse Lorraine Beavers delayed a suicidal patient's medication and left a unit clerk to watch over him by video camera while they attended a mandatory staff meeting. (Meadows Affidavit ¶ 25.) During the meeting, the patient attempted to commit suicide by hanging himself in an area outside the camera's view. (*Id.*) Neither Stewart nor Beavers was disciplined. This incident is unlike Meadows' situation, however, because Stewart and Beavers did not "forget" their duties; instead, they were directed by their supervisor, Jan Black, to put those duties on hold and have the unit clerk monitor the patient. (*Id.*)

### 5. Brenda Elliott

Meadows alleges that registered nurse Brenda Elliott once[12] found a patient collapsed and unconscious in the shower area, ordered a "Code Blue," but, in violation of hospital policy, did not initiate cardiopulmonary resuscitation. (Meadows Affidavit ¶ 25.) Meadows claims that "[h]ospital policy in the psych unit, in this particular situation, is to call the code blue, have a crash

---

[12] Like many of plaintiff's vague allegations, the date on which this incident allegedly occurred is a mystery.

16

cart brought to the patient's room, and the staff is to immediately initiate CPR until the ICN staff responds." (*Id.*) The patient died, but Elliot was not disciplined. (*Id.*) Meadows directs the court to no policy governing such emergencies, nor to any evidence of such a policy. Assuming (as it must) that such a policy as alleged by plaintiff existed, the court still finds Meadows' account of this incident too vague and too different in nature to be a relevant comparator. Elliot apparently exercised judgment in a medical emergency that, in retrospect, may have been flawed. In contrast, Meadows exercised no judgment at all — he simply failed without explanation to perform one of his primary duties as a psychiatric nurse.

### 6. Paul Works

Meadows alleges that several acts of discipline meted out to Paul Works, a male nurse working in the psychiatric unit at Baptist, demonstrate gender bias and discrimination. On one occasion, director of psychiatry Jan Black purportedly "took the word of [a] female patient who was delusional over Paul Works ... and orally reprimanded him for what she [the patient] said that he did, even though the entire nursing staff knew that she was a manipulative patient." (Plaintiff's Brief in Opposition to Summary Judgment at 6.) Even if true, Works' reprimand simply has no bearing on whether Meadows' discharge for neglecting to administer prescribed medications and failing to properly report his error was discriminatory.

17

Meadows also alleges that Works was reprimanded for allowing patients to watch karate movies on television, yet a female nurse was not disciplined for taking patients to see an "R"-rated movie. (Plaintiff's Brief at 6.) Even if true, the situation is not comparable. Neither the hospital's movie viewing policies, nor the hospital's procedures for reporting and documenting such violations, are part of the record before this court. Discipline meted out to Works for such violations does not provide a meaningful comparison.

7. Other incidents

Meadows alleges several other incidents which he claims support an inference that the hospital engaged in disparate treatment between male and female nurses:

> From 1991 to 1995, Jan Black treated the female nurses with respect and dignity more than the male medical personnel. She always let female nurses go home when they got sick, but when Rueben Scott, a white male, got sick in 1994, she refused to let him go home. She took him off into a room and lectured him about his request to go home and he quit right there on the spot. When Myra Holmes, a black female, was beaten up by her boyfriend, Jan Black let her take off from work. But when Russell Harbin's wife needed to go to the hospital for an emergency (suicide threat), Ms. Black would not let him take his own wife to the hospital and made him come to work. Jan Black let Myra Holmes, a female, off to go home to see if the police were raiding her home for drugs. She also let another female accompany her to her home. ...

(Plaintiff's Brief at 7-8 (citations omitted).) Meadows further alleges that "Jan Black gave a charge nurse position in the unit to a female, who was brought in from outside the hospital, over [qualified] male, Charles Gibson, in 1993 ... [when n]ormal

18

procedure is to promote those who want the charge nurse position from within." (*Id.* at 8.) None of those allegations is colorably similar to Meadows' situation; none involve significant medication errors coupled with improper reporting of errors; accordingly, none provide relevant comparators.

Finally, Barbara Turner relates in affidavit two incidents which allegedly demonstrate the hospital's discriminatory treatment of male nurses. First, Turner claims that on the same night Meadows neglected to administer medications, two female nurses failed to search a new patient's room, and drugs were found by nurses working the next shift. Turner contends the failure to search was a violation of hospital policy. Second, she avers that a female patient was assaulted by a male patient while two female nurses on duty were out of the PICU unit. Turner alleges their absence violated hospital policy.

Turner's conclusory allegations are unavailing. Plaintiff has not provided the court with a copy of the "policy" allegedly violated in each instance. Plaintiff has not produced evidence that Jan Black, Meadows' supervisor, knew of those incidents. Finally, plaintiff has not directed this court to any evidence that those incidents are of similar gravity to Meadows' admitted errors. Plaintiff's catalog of hospital blunders simply fails to meet his burden of showing "a similarity between [his] conduct and that of [female] employees who were treated differently." Such broadsides are not relevant to Meadows' claim that he was discharged for

19

infractions which, had he been female, would have elicited less severe punishment. Without such evidence, plaintiff cannot make out a *prima facie* case. Such is the case here. Plaintiff having failed to present a *prima facie* case, no inference of discrimination arises. Thus, the court need not consider defendant's legitimate nondiscriminatory reasons.

## IV. CONCLUSION

For the foregoing reasons, the motion for summary judgment is due to be granted. An order consistent with this memorandum opinion shall be entered contemporaneously herewith.

DONE this __16th__ day of January, 1998.

_____
United States District Judge

20